IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LIZZIE HARRIS, ) | |
| ) | |
| Plaintiff, ) | No. 03 C 4306 |
| ) | Paul E. Plunkett, Senior Judge |
| v. ) | |
| ) | |
| VALLEY VIEW SCHOOL DISTRICT ) | |
| 365-U and SHARON NICHOLS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Lizzie Harris ("Plaintiff") has filed a two-count complaint against Valley View School District 365-U ("Valley View") and Sharon Nichols ("Nichols") (collectively "Defendants") for their alleged violations of the Civil Rights Act and 42 U.S.C. § 1983. Defendants have filed a Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment on both counts of the Second Amended Complaint. Plaintiff also has pending a motion to strike six sentences in Defendants' Local Rule 56.1(a)(3) Statement of Uncontested Facts. For the reasons set forth below, Plaintiff's motion to strike is denied and Defendants' motion for summary judgment is granted.

### Facts

In a nutshell, Plaintiff, an African American woman, contends that the Defendants discriminated against her because she was never promoted from substitute employee to permanent/part-time employee on four separate occasions. Each time, she claims a Caucasian with equal or lesser qualifications received the promotion. Valley View is comprised of seventeen

-1-

schools, each of which operates a kitchen that serves breakfast and lunch to its students. (Defs.' 56.1(a)(3) Statement ¶ 5.) Nichols is Valley View's Director of Food Services and her responsibilities include budgeting and scheduling employees' work hours for each of the seventeen kitchens. *Id.* ¶ 4. The Food Service Department has two classifications of workers, "substitute" employees and "permanent/part-time" employees. *Id.* ¶ 6. Permanent/part-time employees are assigned to a specific school's kitchen and work each school day. *Id.* Substitute employees work on an as-needed basis to replace absent permanent/part-time employees and are not guaranteed a minimum number of hours or days to work. *Id.* ¶ 7. Substitute employees can be assigned to work at any of Valley View's seventeen school kitchens, and they may be told of their work opportunities as early as several days in advance or as late as the morning of the day on which they are needed. *Id.* ¶¶ 6-7.

Plaintiff, an African American female, was hired by Valley View in August 2001 to work as a substitute food services employee. *Id.* ¶¶ 18, 20. Defendants' records indicate that Plaintiff applied for four permanent/part-time positions between January 2002 and October 2003. *Id.* ¶ 19. Plaintiff believes she applied to more than four positions, but does not know the exact number. (Pl.'s 56.1(a)(3) Resp. ¶ 19.) Plaintiff's file contains four evaluations, two of which were written by managers from the kitchens where Plaintiff applied for a permanent/part-time position. (Defs.' 56.1(a)(3) Statement ¶¶ 22-23, 25-26, 35-36.) The top half of each employee's evaluation contains blanks for grading 23 different criteria by a kitchen's manager using a "1" to "5" scale. A "1" denotes "Unacceptable" performance, a "2" denotes that an employee "Need[s] Improvement" in that area, a "3" denotes that an employee's performance is "Satisfactory/Average," a "4" denotes an employee's performance is "Commendable," and a "5" denotes that an employee's performance is

"Superior." Sometimes several criteria are left ungraded. Consequently, not every evaluation contains a grade for each one of the twenty-three criteria. The bottom half of each evaluation contains a space for the manager to discuss the employee's progress, areas in which the employee can improve, and other factors.

After applying for each position, Plaintiff was placed on a work rotation in that school's kitchen to allow the kitchen's manager the opportunity to evaluate Plaintiff and other applicants. *Id.* ¶¶ 21, 23, 26, 29. Plaintiff was not selected for any of the permanent/part-time positions to which she applied. *Id.* ¶¶ 20, 22, 25, 28. In each case, a Caucasian woman was chosen to fill the position. *Id.* On November 14, 2002, after the several rejections, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination. (Sec. Am. Compl., Ex. E.) The EEOC issued Plaintiff a right-to-sue letter on March 21, 2003. *Id.*, Ex. F. Plaintiff timely filed her complaint on June 23, 2003. *Id.*

Defendants contend that each school's kitchen manager makes the ultimate hiring decisions for all permanent/part-time positions in the kitchen although the managers may receive a recommendation from Shelby Justice ("Justice"), Sharon Nichols' executive secretary. (Defs.' 56.1(a)(3) Statement ¶¶ 8, 30, 39.) Defendants maintain that the kitchen managers are free to ignore such recommendations. *Id.* ¶ 32. In contrast, Plaintiff believes that either Justice or Nichols makes the final hiring decision for permanent/part-time positions. (Harris Dep. at 12-15.) However, both parties agree that such decisions are not based upon a worker's seniority. (Defs.' 56.1(a)(3) Statement ¶ 16.)

After Plaintiff applied for a position at and had a work rotation through the Irene King Elementary School kitchen, Susan Kroll, the kitchen manager there, expressed an interest in hiring

Plaintiff for the permanent/part-time position. *Id.* ¶ 30. At that point, Justice tried to discourage Kroll from hiring Plaintiff because Plaintiff's work history demonstrated that she "would 'go and hide,' would not carry her work load, would not contribute, tended not to be a team player, was late, not reliable and had a very poor attendance record." *Id.* Another candidate was hired for the position. *Id.* ¶ 33.

During the time period in question, Valley View School District's Food Service Department employed approximately 184 employees, including both substitute and permanent/part-time employees. *Id.* ¶ 37. Approximately nineteen of those employees were Hispanic and seventeen, including Plaintiff, were African American. *Id.* During this time period, eight of the African American employees, including Plaintiff, applied for a total of twenty two permanent/part-time positions.[1] *Id.* ¶ 38. Four of the eight were selected for permanent/part-time positions. *Id.* Of those four, three later applied for and received a subsequent, lateral permanent/part-time position. *Id.*

## Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all

---

[1] The record does not identify how many of these eight African American employees were substitute employees, like Harris, who sought to become permanent/part-time employees or whether some of them were already permanent/part-time employees seeking a lateral move to another permanent/part-time position.

-4-

evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Discussion

As an initial matter, we address Plaintiff's motion to strike. Plaintiff seeks to strike six sentences in Defendant's Local Rule 56.1(a)(3) Statement of Uncontested Facts, because they are either statements of opinion or subjective analysis. A motion to strike is not necessary in such a situation; rather, "argument masquerading as fact [in a 56.1(a)(3) statement] will [simply] not be considered by the court." *Krause v. Alberto-Culver Co.*, No. 97 C 3085, 1999 WL 967015, at *1 (N.D. Ill. Oct. 18, 1999). Therefore, the Court will simply not consider the contested sentences and Plaintiff's motion to strike is denied.

In Count I, Plaintiff alleges employment discrimination by Defendants in violation of Title VII. Under Title VII, "a plaintiff may prove discrimination through either direct or circumstantial evidence or the indirect burden-shifting method" used in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999). Plaintiff acknowledges that she does not have any direct evidence of discrimination and must satisfy the *McDonnell Douglas* indirect method. (Pl.'s Mem. Opp'n Summ. J. at 3.) The *McDonnell Douglas* method first requires a plaintiff to prove a "prima facie" case of racial discrimination. 411 U.S. at 802. If a plaintiff satisfies this initial burden, the defendant must demonstrate a "legitimate, nondiscriminatory reason" for defendant's action. *Id.* If defendant demonstrates a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that the reason was "actually

a pretext for discrimination." *Jackson*, 176 F.3d at 982; *see McDonnell Douglas*, 411 U.S. at 804-05.

Plaintiff does not meet her burden to prove a prima facie case of discrimination. Plaintiff suggests that the proper prima facie test is the one used in *McDonnell Douglas*, a case involving an employee who was discharged due to a reduction in force and later was not rehired allegedly because of his race despite being qualified. (Pl.'s Mem. Opp'n Summ. J. at 3.; 411 U.S. at 794-96.) However, footnote 13 of *McDonnell Douglas* states, "the specification above of the prima facie proof required from the respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802. Likewise, Defendants maintain the proper *McDonnell Douglas* test to be used instantly is the test from *Logan v. Kautex Textron North America*, 259 F.3d 635, 640 (7th Cir. 2001). However, *Logan* addressed an African American employee who was discharged, and the test in that case was tailored to deal with an alleged improper dismissal. *Id.* at 637. This case concerns Defendants' failure to promote Lizzie Harris from a substitute position to a permanent/part-time position. As such, the proper *McDonnell Douglas* test is one that addresses the unique factual disposition of a failure to promote claim. In a failure to promote case under Title VII, a plaintiff must prove the following prima facie elements by a preponderance of the evidence: "(1) [plaintiff] is a member of a protected class; (2) she is qualified for the position; (3) she was rejected for the position sought; and (4) the position was granted to a person outside the protected class who is similarly or less qualified than [plaintiff]." *Jordan v. City of Gary*, 396 F.3d 825, 833 (7th Cir. 2005); *e.g., Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 273 (7th Cir. 2004); *Ghosh v. Ind. Dep't. of Envtl. Mgmt.*, 192 F.3d 1087, 1091 (7th Cir. 1999); *Brill v. Lante Corp.*, 119 F.3d 1266, 1270 (7th Cir. 1997).

Plaintiff clearly meets the first three elements. First, Defendants admit that Plaintiff is African American, a protected classification. (Defs.' 56.1(a)(3) Statement ¶ 25.) Second, Defendants admit that "'qualifications' are not an issue for the type of position at issue." (Defs.' Mem. Supp. Summ. J. at 8.) Third, Plaintiff was rejected for all the permanent/part-time positions she sought. (Defs.' 56.1(a)(3) Statement ¶¶ 20, 22, 25, 28.)

Nonetheless, no reasonable jury could find that Plaintiff meets the fourth element by a preponderance of the evidence. Plaintiff argues that all of the positions that Plaintiff sought were given to Caucasians. (Pl.'s Mem. Opp'n Summ. J. at 4.) However, those persons who were ultimately hired instead of Plaintiff were not similarly qualified as Plaintiff. They were more qualified. The record contains four evaluation forms for Lizzie Harris. (Defs.' Mot. Summ. J. Ex. 8). The bottom half of the form includes written comments which are difficult to compare and contrast between candidates, but the top half contains a numerical grading of her performance across different areas. Plaintiff's average scores on these forms in chronological order are 2.778, 2.667, 2.308, and 2.231.[2] Thus, Plaintiff's scores decreased over time and in no case did her average meet or exceed 3.0, which would signify "Satisfactory/Average" performance.

Each of the four women who were given permanent/part-time positions instead of Plaintiff,

---

[2] In her first evaluation at the Jane Addams school (undated) for the work she did between October 15 and October 19, 2001, Plaintiff received 2 "2"s and 7 "3"s, giving her an average score of 2.778. In her second evaluation dated September 25, 2002, for the work she did at the Oak View school on that day, Plaintiff received 7 "2"s and 14 "3"s, giving her an average score of 2.667. In her third evaluation dated October 2, 2002, for the work she did at the Jamie L. McGee school on September 26, 2002, Plaintiff received 9 "2"s and 4 "3"s, giving her an average score of 2.308. In her fourth evaluation dated November 21, 2002, for the work she did at the J.R. Tibbett school between November 18 and November 20, 2002, Plaintiff received 10 "2"s and 3 "3"s, giving her an average score of 2.231. Because each of these evaluations was for work that Plaintiff did at different schools, each evaluation was submitted by a separate manager.

had higher average scores than Plaintiff. Rhonda Martin was selected for the permanent/part-time position at Romeoville High School. (Defs.' 56.1(a)(3) Statement ¶ 20.) The record contains three of her evaluations. (Defs.' Mot. Summ. J. Ex. 7.) Her average score on each evaluation was 3.000.[3] Michelle Gebbia was selected for the position at Jamie McGee Elementary School. (Defs.' 56.1(a)(3) Statement ¶ 22.) The record contains two of her evaluations. (Defs.' Mot. Summ. J. Ex. 11.) Her average scores on the evaluations were 3.870 and 3.000.[4] Denise Windle was selected for the position at Oak View Elementary School. (Defs.' 56.1(a)(3) Statement ¶ 25.) The record contains four of her evaluations. (Defs.' Mot. Summ. J. Ex. 14.) Her average scores on the evaluations were 3.000, 3.652, 2.955, and 3.063.[5] Mary Gleason was selected for the position at Irene King Elementary School. (Defs.' 56.1(a)(3) Statement ¶ 28.) The record contains nine of her evaluations. (Defs.' Mot. Summ. J. Ex. 17.) Her average scores on the evaluations were 3.342,

---

[3] Martin's first evaluation dated October 15, 1999, for her work at the "RCH" school, contained 20 "3"s. Her second evaluation dated February 29, 2000, for her work at the Valley View school, contained 14 "3"s. Her third evaluation dated May 8, 2000, for her work at the Valley View school, contained 11 "3"s. The average score on each of these evaluations is 3.000.

[4] Gebbia's first evaluation dated September 5, 2003, for her work at Oak View Elementary School between August 23 and September 4, 2002, contains 4 "3"s, 18 "4"s, and 1 "5", giving her an average score of 3.870. Her second evaluation dated September 27, 2003, for her work at Jamie McGee Elementary School between September 23 and September 24, 2002, contains 19 "3"s, giving her an average score of 3.000.

[5] Windle's first evaluation dated September 27, 2002, for her work at Independence Elementary School between September 23 and September 24, 2002, contains 17 "3"s, giving her an average score of 3.000. Her second evaluation dated October 15, 2002, for her work at the Wood View school over an unlisted period of time, contains 11 "3"s, 9 "4"s, and 3 "5"s, giving her an average score of 3.652. Her third evaluation dated October 17, 2002, for her work at Oak View Elementary School between October 15 and October 16, 2002, contains 1 "2" and 21 "3"s, giving her an average score of 2.955. Her fourth evaluation dated October 18, 2002, for her work at B.J. Ward Middle School on October 17 and October 18, 2002, contains 15 "3"s and 1 "4", giving her an average score of 3.063.

3.300, 3.833, 4.476, 4.333, 3.913, 3.714, 3.000, and 5.000.[6]

When comparing employees' performances in a failure to promote case, the Court is required to look at all relevant factors, keeping in mind that courts are not super personnel departments. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531-32 (7th Cir. 2003). First, Plaintiff's average scores fell below 3.0, which signifies that all four of her evaluators found her performance to be less than "Satisfactory/Average." Second, two of Plaintiff's four evaluators wrote an evaluation for one or more of the successful applicants, reducing the possibility that the successful applicants were evaluated on different criteria than Plaintiff. Third, the successful applicants' average scores met or surpassed 3.0, which denotes a "Satisfactory/Average" performance, in eighteen of the nineteen evaluations over their collective employment with the school district. The only average score below 3.0 among the four successful applicants was Denise Windle's October 17, 2002 evaluation in which her average was 2.955 when she had 21 "Satisfactory/Average" marks and one "Need Improvement" mark. Fourth, none of the successful applicants ever had more than one "Need Improvement" mark

---

[6] Gleason's first evaluation was undated sometime shortly after her hiring in 1987. It evaluates her work at Wood View Elementary School. It contains 1 "2 ½", 11 "3"s, and 7 "4"s, giving her an average score of 3.342. Her second evaluation was undated. It evaluates her performance at Wood View Elementary School between October 26 and November 6, 1987. It contains 1 "2", 12 "3"s, and 7 "4"s, giving her an average score of 3.300. Her third evaluation dated January 1989, for her work at Wood View Elementary School, contains 4 "3"s, 13 "4"s, and 1 "5", giving her an average score of 3.833. Her fourth evaluation dated March 1990, for her work at Wood View Elementary School, contains 11 "4"s and 10 "5"s, giving her an average score of 4.476. Her fifth evaluation dated June 1991, for her work at Wood View Elementary School, contains 14 "4"s and 7 "5"s, giving her an average score of 4.333. Her sixth evaluation dated May 1996, for her work at Wood View Elementary School, contains 1 "2", 6 "3"s, 10 "4"s, and 6 "5"s, giving her an average score of 3.913. Her seventh evaluation undated sometime in 1997, for her work at Wood View Elementary School, contains 6 "3"s and 15 "4"s, giving her an average score of 3.714. Her eighth evaluation dated April 1998, for her work at Wood View Elementary School, contains 23 "3"s, giving her an average score of 3.000. Her ninth evaluation dated April 14, 1999, for her work at Wood View Elementary School, contains 2 "5"s, giving her an average score of 5.000.

on a single evaluation while Plaintiff had a minimum of seven "Need Improvement" marks on all three of her 2002 evaluations. The only time Plaintiff had fewer than seven "Need Improvement" marks was at the beginning of her employment in 2001 when she had two such marks, suggesting her performance declined over time. Fifth, Plaintiff's highest average score, 2.778, is lower than each of the successful applicants' lowest average scores. In addition, Plaintiff has not shown that a non-African American person in her same job with the her same performance evaluations was treated more favorably.

So far our analysis has only taken into consideration the top, quantitative parts of the evaluations. However, our review of the bottom, qualitative parts of the evaluations suggests that, by and large, they too are negative. For example, in her October 2001 performance appraisal, the evaluator noted that Plaintiff was "late for work in a 2 hour spot." (Defs.' Mot. Summ. J. Ex. 8). Her September 26, 2002 evaluation stated that she needs to "move a little faster, show some interest in the job, [and seek] more responsibility than just standing there." *Id.* Finally, in November 2002, her evaluator observed that "[w]e have not seen any improvement since last year. She doesn't ask what she can do. She will just stand there. . . . I had to let her know that when she is a 2 hour person she [can eat] something [only] after she punches out for the day." *Id.* These written evaluations are decidedly more negative than those of the successful applicants, whose evaluations included such comments as "great job" and "fine job." (Defs.' Mot. Summ. J. Ex. 10, 14, 17). As such, Plaintiff cannot prove the fourth element in her prima facie case by a preponderance of the evidence under *McDonnell Douglas* because the record does not support her claim that she was better or equally qualified than any of the four successful applicants. Therefore, Defendants' motion for summary judgment as to Count I is granted.

In Count II, Plaintiff alleges constitutional discrimination by Defendants under 42 U.S.C. § 1983. In order to assert a § 1983 violation, a plaintiff must demonstrate that the "defendant caused or participated in a constitutional deprivation." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994). Plaintiff blanketly asserts, with no evidentiary support whatsoever, that Valley View and Nichols had a "pattern and practice of racial discrimination" that "has deprived her of her rights, privileges and immunities secured by the United States Constitution and other laws." (Sec. Am. Compl. ¶¶ 41-42.)

This claim is improper against Defendant Nichols. The Second Amended Complaint does not state whether the claim is against Nichols in her individual or official capacity. Therefore, both will be addressed. First, Nichols is not liable in her individual capacity. The test for individual liability is whether Nichols' conduct violated Plaintiff's clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Nichols' failure to promote Plaintiff did not violate Plaintiff's rights, because no evidence in the record suggests that race was a factor in determining which employees to promote. The decision not to promote Plaintiff was based on her inferior evaluations and the superior performance of the chosen applicants. Thus, Nichols cannot be held liable in her individual capacity.

Second, Nichols is also not liable in her official capacity. To be liable in an official capacity, Plaintiff must show that Nichols is an "official 'who speak[s] with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *Duda v. Bd. of Educ. Of Franklin Park Sch. Dist. No. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). "In Illinois, a School District's Board of Education has full power to manage the schools

and to adopt all rules and regulations needed for that broad purpose." *Duda*, 133 F.3d at 1061. Nichol's official position is Director of the Food Service Department of the Valley View School District. (Defs.' 56.1(a)(3) Statement ¶ 3.) Plaintiff has made no showing and the record does not support that the School District granted Nichols policymaking authority with respect to personnel decisions. Thus, Nichols cannot be held liable in her official capacity.

Valley View's alleged constitutional violations against Plaintiff are also without merit. There are three ways in which a municipality can be deemed to have violated an individual's constitutional rights:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Baskin v. City of Des Plaines*, 138 F.3d 701, 704-05 (7th Cir. 1998). Plaintiff does not claim and the undisputed facts do not suggest the existence of any express policy to cause constitutional deprivations by Valley View. In addition, the evidence does not point to any injury caused by a person with final policymaking authority. Plaintiff's only possible § 1983 claim against Valley View is to show a permanent, well settled, and widespread practice that violates Plaintiff's constitutional rights.

Because Plaintiff did not articulate the facts upon which she predicates her belief in Valley View's widespread racial discrimination practice, the Court independently reviewed the record looking for such facts. Our review found no facts which suggest a permanent, well settled, and widespread practice of racial discrimination by Valley View. In contrast, the facts suggest that

Valley View did not discriminate on the basis of race in its food service promotions. Eight African Americans, including Plaintiff, applied for a total of twenty-two permanent/part-time positions during the time in question. (Defs.' 56.1(a)(3) Statement ¶ 38.) Four of the eight, received permanent/part-time positions. *Id.* ¶¶ 38, 40-43. Three of these four applied for and received a subsequent permanent/part-time position soon thereafter. *Id.* ¶¶ 38, 44-45, 47.

Plaintiff does, however, maintain that the employment record of one of these four successful African American applicants, Annette Edwards, will demonstrate that race was a factor in considering promotions. Edwards, like Plaintiff, was a substitute worker not initially chosen for a permanent/part time position for which she applied. (Pl's 56.1(b)(3)(B) Statement ¶ 1.) After filing a claim with the EEOC, Edwards' evaluations improved and Edwards was offered a permanent/part-time position. (*Id.* at 2.; Pl.'s. Mem. Opp'n Summ. J. Ex. 00003- 00006) Plaintiff believes Edwards was offered a permanent/part-time position at Plaintiff's expense, stating that Plaintiff was rejected "because the 'black' quota for promotions had just been filled." (Pl.'s Mem. Opp'n Summ. J. at 5.) Edwards interprets her own initial lack of promotion and subsequent filing of an EEOC complaint differently. She also does not mention the existence of a "black quota." Despite Plaintiff's contention, Edwards' promotion does not appear to be part of a widespread racial discrimination practice in Valley View's Food Service Department. In contrast, her promotion suggests that workers whose performances improve over time will be promoted regardless of their race.

Taken as a whole, the record does not provide any intimation that consideration of an applicant's race was ever a custom or usage in the hiring process. A significant proportion of African American applicants have been successfully promoted to permanent/part-time positions. Whether the final decisions were made by Nichols or each individual kitchen's manager, the only

criteria for promotion appear to be good performance and evaluations. There is no showing that Valley View has a widespread practice of racial discrimination. Therefore, Defendants' motion for summary judgment as to Count II is granted.

## Conclusion

For the reasons set forth above, Plaintiff's motion to strike is denied with prejudice. Because there is no genuine issue of material fact on any of the claims Plaintiff asserts against Defendants, Defendants' motion for summary judgment is granted with prejudice. This is a final and appealable order.

**ENTER:**

*[signature]*

**UNITED STATES DISTRICT JUDGE**

**DATED:** FEB 2 2006